**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| **PARVIZ PARSIA;** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | **NO.  07-CV-2436** |
| **vs.** | : | |
| | : | |
| **ALLIED TUBE & CONDUIT CORP.;** | : | |
| **Defendant.** | : | |
| _____ | : | |

### ORDER & MEMORANDUM

### O R D E R

**AND NOW**, this 18th day of March, 2009, upon consideration of the Motion of

Defendant, Allied Tube & Conduit Corporation for Summary Judgment Pursuant to Fed. R. Civ.

P. 56 (Document No. 24, filed May 2, 2008), and Plaintiff Parviz Parsia's Brief in Opposition to

Defendant's Motion for Summary Judgment (Document No. 25, filed May 30, 2008),

Defendant's Reply Brief in Further Support of Motion for Summary Judgment (Document No.

27, filed June 11, 2008), Plaintiff Parviz Parsia's Supplemental Brief in Opposition to

Defendant's Motion for Summary Judgment (Document No. 32, filed February 3, 2009), and

Defendant's Sur-Reply Brief in Further Support of Motion for Summary Judgment (Document

No. 34, filed February 11, 2009), for the  reasons set forth in the attached Memorandum, **IT IS**

**ORDERED** that defendant's Motion for Summary Judgment is **GRANTED**, and **JUDGMENT**

**IS ENTERED** in **FAVOR** of defendant, Allied Tube & Conduit Corporation, and **AGAINST**

plaintiff, Parviz Parsia.

**IT IS FURTHER ORDERED** that the Clerk shall **MARK** the case as **CLOSED FOR**

**STATISTICAL PURPOSES**.

1

<u>**M E M O R A N D U M**</u>

## I.    Introduction

This case arises out of plaintiff Parviz Parsia's termination on March 4, 2006 from his position as the Lab and Paint Supervisor at the Philadelphia manufacturing facility of defendant Allied Tube & Conduit Corporation ("Allied"). Plaintiff asserted the following claims in his First Amended Complaint: (1) race and national origin discrimination under Title VII of the Civil Rights Act of 1964 and 1991, as amended, 42 U.S.C. § 2000(e), and 42 U.S.C. § 1981 (Count I); (2) religious discrimination under Title VII of the Civil Rights Act of 1964 and 1991, as amended, 42 U.S.C. § 2000(e), and 42 U.S.C. § 1981 (Count II); and (3) hostile work environment under the Pennsylvania Human Relations Act, 43 Pa. C.S.A. § 951 ("PHRA") (Count III).[1]

Presently before the Court is defendant's Motion for Summary Judgment. For the reasons that follow, defendant's Motion for Summary Judgment is granted.

## II.    Background

Plaintiff Parviz Parsia, an Iranian male who is Zoastrian, began his employment with Allied—a company that manufactures electrical tubing and conduit products—on April 18, 2005. (Def.'s Mot. 3, 4; Pl.'s Resp. 1; Parviz Parsia Dep. 33:21–34:2, 36:22–23, Nov. 7, 2007, Ex. A to Def.'s Mot.) Plaintiff was hired as a Laboratory and Paint Supervisor at Allied's Philadelphia manufacturing facility. (Def.'s Mot. 4; Pl.'s Resp. 1.) Plaintiff first interviewed for this position

---

[1] The Court notes that although plaintiff's hostile work environment claim under the PHRA is labeled "Count IV" in the Amended Complaint, it is in fact the third and final count in the Amended Complaint. (See Am. Compl. ¶ 54.) Accordingly, the Court will refer to plaintiff's hostile work environment claim under the PHRA as "Count III."

in March 2005 with Richard Waggoner, then Industrial Relations Manager (i.e., Human Resources Manager), David Pliner, the Technical Manager, and Manzoor Chaudhry, the Laboratory Coatings Manager. (Def.'s Mot. 3; Parsia Dep. 35:16–23.) At Allied, plaintiff's responsibilities included supervision of a team of laboratory technicians who monitored and analyzed the chemical composition of Allied's products. (Def.'s Mot. 4; Parsia Dep. 41:24–43:19.) Plaintiff's immediate supervisor was Mr. Chaudhry, who in turn reported to Mr. Pliner. (Def.'s Mot. 4; Parsia Dep. 40:9–15.) Mr. Pliner also supervised plaintiff. (Parsia Dep. 44:12–23.)

 In his employment papers, plaintiff marked his "ethnic origin" as "white." (Id. at 57:11–13.) However, plaintiff considers his race to be "white" and his national origin to be Iranian. (Id. at 57:21–58:2.) "Although I consider myself white," plaintiff asserts, "I don't think a hundred percent of Americans would consider me white." (Id. at 129:7–9.) Plaintiff believes he was the only employee at Allied's Philadelphia manufacturing facility who was Middle Eastern and the only employee who was Zorastrian. (Id. at 86:3–4, 86:10–13.)

According to plaintiff, "the majority of people" at Allied knew plaintiff was Iranian or Persian. (Id. at 84:1–4.) Plaintiff stated that he had explained to Stephen Norvilas, the General Manager, that he was Iranian and Zorastrian. (Id. at 87:7–88:3.) Plaintiff asserts that Mr. Waggoner and Mr. Pliner knew he was Iranian because he "believe[s] that [he] told them" as they had asked him about his background "because of [his] accent." (Id. at 85:4–10.) Moreover, on the day he was hired, either Mr. Waggoner or Mr. Pliner brought plaintiff to Mr. Chaudhry, who is from Pakistan, and said "[h]ere is your friend," presumably because they looked alike. (Id. at 84:8–15.)

3

Plaintiff stated that Elmer Foster, the Operations Manager,[2] and Don Davison, then Mill Supervisor,[3] knew that he was Iranian because: "[t]hey asked me. I have an accent. I told them where I come from." (Id. at 89:3–16.) However, plaintiff does not recall whether he informed Mr. Waggoner, Mr. Pliner, Mr. Foster, or Mr. Davison of his religion; he "believe[s] they knew through [Mr. Chaudhry]" but does not know for a fact whether Mr. Chaudhry told them or not. (Id. at 88:22–89:2.)

Plaintiff does not recall any instances where anyone at Allied made a negative or threatening comment about his race, national origin, or religion. (Id. at 89:24–90: 22.) However, plaintiff felt that one employee, Mr. Davison—who was at the same level of supervision as plaintiff, though in a different department—bullied plaintiff. (Id. at 11–13, 97:22–24.) Plaintiff estimates that on approximately five to ten occasions, Mr. Davison "was hostile" and "was using the F word" in situations involving water leaks in areas that Mr. Davison "was supposed to supervise." (Id. at 92:6–12, 93:8–9.)

One specific instance plaintiff recollects involved a water leak that plaintiff asked Mr. Davison to repair, and Mr. Davison responded by telling plaintiff to "[g]o F'ing do [it] yourself." (Id. at 91:14–23.) Plaintiff stated that he did not know "for sure" whether Mr. Davison made those comments because of his race or national origin. (Id. at 97:17–21.) Plaintiff reported this incident to Mr. Chaudhry and Mr. Pliner and had complained to them about Mr. Davison's

---

[2] Mr. Foster was initially hired at Allied in 1981. (Elmer Foster Dep., 12:8–9, Nov. 28, 2007, Ex. C to Def.'s Mot.) As Operations manager, he is "responsible for the production equipment in the plant" such as the basic operations and manufacturing of tubing. (Id. at 13:7–11.) Mr. Foster reported to Stephen Norvilas, the General Manager. (Parsia Dep. 46:8–10.)

[3] Mr. Davison retired from Allied around February 2007. (Don Davison Dep., 12:18–24, Jan. 8, 2008, Ex. D to Def.'s Mot.)

4

behavior about two or three times in the past. (Id. at 95:19–96:10.) Mr. Chaudhry and Mr. Pliner were "supportive" of plaintiff when he expressed these complaints. (Id. at 96:11–14.) Although plaintiff wanted Mr. Chaudhry and Mr. Pliner "to create a better atmosphere" in response to his complaints, plaintiff felt that they failed to do so. (Id. at 97:9.) However, plaintiff admits that he never requested specific remedial actions such as bringing the complaint to the attention of Human Resources or the Tyco Concern Line. (Id. at 96:20–97:2.)

The incident that precipitated the filing of the instant lawsuit occurred shortly after noon on March 1, 2006. At that time, plaintiff was in the Mill office[4] and became engaged in a conversation with Mr. Foster over plaintiff's request to another supervisor to repair a leaking induction box.[5] (Def.'s Mot. 4, 5; Pl.'s Resp. 1; Parsia Dep. 100:5–8, 107:20–21.) According to plaintiff, Mr. Foster began yelling at plaintiff angrily, "a few inches from [his] face" and with such intensity that particles of saliva sprayed into plaintiff's face. (Def.'s Mot. 5; Parsia Dep. 107:24–108:19.) Mr. Foster also used profanity. (Richard Waggoner Dep. 64:23–65:2, Dec. 19, 2007, Ex. B to Def.'s Mot.; Parsia Dep. 108:10, 109:12.)

During this interaction, plaintiff reached out his hands and touched Mr. Foster's upper torso around the front of his shoulders. (Def.'s Mot. 5; Parsia Dep. 111:13–112:8.) A witness to the situation, Mr. Davison, interjected that plaintiff had just touched Mr. Foster, whereupon Mr. Foster "stamp[ed] his feet on the floor" and said "you touched me motherfucker . . . ." (Parsia Dep. 109:15–22, 111:11–12.) Plaintiff then left the office. (Id. at 110:1–4.)

---

[4] The Mill office is the Mill Supervisor's workstation. (Waggoner Dep. 59:23–24.)

[5] An induction box is a "high-energy type of box" that is used to heat or cool pipes. (Parsia Dep. 100:9–16.)

Plaintiff was "shocked" by Mr. Foster's behavior as plaintiff considered him "a nice guy" and a "[f]riend in the work environment." (Id. at 98:18–22.) On one occasion, Mr. Foster suggested that plaintiff could join him to go sailing, and plaintiff even brought Mr. Foster a "little boat" memento as a gift. (Id. at 99:9–19.) However, plaintiff asserts that Mr. Foster has a history of aggressive and verbally abusive behavior at Allied for which he was never disciplined. (Pl.'s Resp. 7.) First, in or around 2004, Mr. Foster "aggressively confronted" an auditor—Matthew Towne—by raising his voice and using foul language. (Pl.'s Resp. 7; Waggoner Dep. 79:24–81:21.) After Mr. Towne complained about this behavior to Mr. Norvilas, Allied did not discipline Mr. Foster but suggested that he voluntarily attend anger management therapy, which Mr. Foster did. (Waggoner Dep. 79:24–81:21; Stephen Norvilas Dep., 56:16–62:18, Jan. 8, 2006, Ex. F to Def.'s Mot.)

Second, Mr. Norvilas noted in Mr. Foster's performance evaluation for the year that ended on March 7, 2002 that Mr. Foster had "negative outbursts . . . with union management and Tyco auditors," "[m]ust learn to stay away from personality conflicts," and was "fighting too many windmills the last 8 months." (Pl.'s Resp. 7–8; Norvilas Dep. 64:19–67:6.) Mr. Norvilas had "intentionally delayed" his review of Mr. Foster for three months to address such problems and provide more "direction" and "counseling sessions" to him. (Norvilas Dep. 65:9–11, 65:15–18.) Mr. Foster ultimately received a "satisfactory plus" rating in that evaluation. (Id. at 64:22–23.) Finally, Mr. Waggoner received complaints about Mr. Foster's "management style"—namely, that "he gets agitated, come[s] on very strong with employees he is talking to," and "raises his voice [or] use[s] bad language to try to make his point." (Waggoner Dep. 83:18–23.)

6

On March 1, 2006—the day of the incident between plaintiff and Mr. Foster—Mr. Foster reported the incident to Mr. Pliner, who then joined Mr. Foster in reporting it to Mr. Waggoner. (Def. Mot. 5; David Pliner Dep. 40:6–41:13, Jan. 8, 2008, Ex. E to Def.'s Mot.) Mr. Foster told Mr. Waggoner that he and plaintiff had an argument and that plaintiff "pushed him hard enough [so that] he fell backwards and had to [re]gain his balance." (Waggoner Dep. 56:25–57:7.) Mr. Foster also informed Mr. Waggoner that Mr. Davison was present during this incident. (Id.) Afterward, Mr. Waggoner and Mr. Pliner paged plaintiff to meet with them, at which time Mr. Waggoner sent plaintiff home with pay pending the outcome of an investigation. (Waggoner Dep. 58:3–6; Pliner Dep. 41:14–15; Parsia Dep. 115:12–16.) During this brief meeting, plaintiff attempted to communicate his version of what transpired with Mr. Foster—namely, that plaintiff did not push Mr. Foster, but touched him with "the tip of [his] fingers" in an effort "to calm him down." (Parsia Dep. 109:7–10, 111:13–112:8, 114:9, 115:20–22.)

Mr. Waggoner subsequently conducted an investigation and spoke with Mr. Foster, Mr. Davison, plaintiff, and two other employees. (Waggoner Dep. 58:20–22, 61:23–24, 62:13, 64:7–9; Pl.'s Resp. 2.) Mr. Waggoner and Mr. Norvilas first interviewed Mr. Foster. (Waggoner Dep. 58:20–22, 59:6–9.) Mr. Waggoner then spoke with Mr. Davison. (Id. at 59:20–60:23.) In an effort to verify certain facts cited by Mr. Foster—facts concerning the induction box leak underlying the argument between plaintiff and Mr. Foster—Mr. Waggoner also consulted Bob Barrett, the 2P Mill Supervisor, and Ed Golaszewski, the Third Shift Supervisor. (Waggoner Dep. 61:20–62:14; Parsia Dep. 102:5–15.)

On Friday, March 3, 2006, Mr. Waggoner called plaintiff in for an interview with himself and Mr. Pliner. (Waggoner Dep. 64: 6–9.) During the interview, plaintiff explained his version of

7

events. In particular, plaintiff told Mr. Waggoner and Mr. Pliner that Mr. Foster "got agitated, started raising his voice, [and] started swearing." (Id. at 64:18–65:3.) Plaintiff then "approached" Mr. Foster, "was telling [him] to calm down, . . . put his hands out and touched [Mr. Foster's] shirt with his extended fingers." (Id. at 64:18–65:3.) At that point, Mr. Davison commented that plaintiff should "stop pushing" Mr. Foster and that Mr. Foster "took his helmet off and threw it in the office" while stating to plaintiff: "don't ever put your hands on me . . . ." (Id. at 64:3–9.)

Later that day, Mr. Waggoner made the ultimate decision to terminate plaintiff, a decision with which Mr. Pliner and Mr. Norvilas concurred. (Waggoner Dep. 66:2–5, 66:22–24, 67:6–14l; Pliner Dep. 49:14–25, 52:12–17.) That decision was based in large part on Allied's disciplinary policy, which provides that violation of a "Group I offense" (e.g., assaulting another employee) "subjects the employee to discharge on the first offense." (Pliner Dep. 33:9–12; Waggoner Dep. 44:16–19.) Specifically, Mr. Waggoner said he decided to terminate plaintiff because "two long-term employees, one senior management [and] one junior management," who he has "never known . . . to ever lie about a situation," provided a version of events that conflicted with the version presented by plaintiff, "a short-term employee" who "admitted that he approached [Mr. Foster] and put his hands on—touched [him]." (Waggoner Dep. 67:17–68:1.)

Mr. Waggoner informed plaintiff that his termination was effective March 4, 2006. (Parsia Dep. 59:5–7, 60:13–15.)

## III.   Procedural History

On May 17, 2006, plaintiff filed a Charge of Discrimination against Allied with the Equal Employment Opportunity Commission ("EEOC"). (Def.'s Mot. 2; Pl.'s Resp. 3.) The EEOC issued plaintiff a Dismissal and Notice of Right to Sue ("Notice of Right to Sue") on February, 8,

2007, which plaintiff received on February 9, 2007. (Def.'s Mot. 2; Pl.'s Resp. 3.) On May 7, 2007, counsel for plaintiff signed a business cover letter, a civil cover sheet for the Court of Common Pleas of Philadelphia Trial Division, a check payable to the Prothonotary of Philadelphia for $267.30, and at least one copy of plaintiff's complaint for delivery to the Court of Common Pleas of Philadelphia. (Pl.'s Supplemental Br. Opp. Def.'s Mot., Ex. A.) These items were then shipped using Federal Express Overnight Express mail. (Federal Express US Airbill, May 7, 2007, Ex. A to Pl.'s Supplemental Br. Opp. Def.'s Mot.) On May 8, 2007, Federal Express delivered these items—and obtained a signature upon delivery—to the Office of the Prothonotary of the Court of Common Pleas of Philadelphia ("Prothonotary"). (Letter from Federal Express with Delivery Information, Jan. 31, 2009, Ex. B to Pl.'s Supplemental Br. Opp. Def.'s Mot.)

Upon receipt of the complaint, the Prothonotary stamped the back of the original complaint "Mail Received, 2007 May 8 - AM 10:[]." Within a couple of hours, the Prothonotary again stamped the back of the original complaint "Presented for Review, 2007 May 8 - PM 12:58." Plaintiff alleges that the Prothonotary also stamped the front of one copy of the complaint "Attest - May 8, 2007." (Copy of Complaint, Ex. C to Pl.'s Supplemental Br. Opp. Def.'s Mot.) However, after obtaining plaintiff's original version of this document, the Court finds that the stamp is illegible.

By letter dated May 11, 2007, the Prothonotary returned plaintiff's materials, stating: "I regret that I must return all the enclosures received from you. These papers are unacceptable for filing for the following reasons: Fee due." (Letter from Prothonotary, May 11, 2007, Ex. C to Pl.'s Supplemental Br. Opp. Def.'s Mot.) On May 15, 2007, plaintiff sent the complaint and the

correct filing fee of $278.30—which included the Sheriff's Fee that was missing from plaintiff's

initial submission—to the Prothonotary. (Pl.'s Supplemental Br. Opp. Def.'s Mot. 2; Civil Cover

Sheet and Federal Express US Airbill, May 15, 2007, Ex. D to Pl.'s Supplemental Br. Opp.

Def.'s Mot.) The Prothonotary stamped the back of the original complaint "Mail Received, 2007

May 16 - AM 11:09" and "Presented for Review, 2007 May 16 - PM 2:16." The Prothonotary

then stamped the front of at least one copy of the complaint "Attest - May 16, 2007," and

docketed plaintiff's complaint as filed. (Copy of Complaint Attached to Notice of Removal, Ex.

M to Def.'s Mot.; Civil Docket Report, July 23, 2007, Ex. K to Def.'s Mot.)

On June 15, 2007, Allied filed a Notice of Removal to the Eastern District of

Pennsylvania. (Def.'s Mot. 2; Pl.'s Resp. 3.) Plaintiff filed a three-count First Amended

Complaint on June 29, 2007. (Def.'s Mot. 2; Pl.'s Resp. 3.) On July 13, 2007, Allied filed a

Partial Motion to Dismiss on the grounds of statute of limitations and failure to state a claim

upon which relief can be granted. (Def.'s Mot. 3; Pl.'s Resp. 3; Partial Mot. Dismiss 1.) This

Court denied Allied's Partial Motion to Dismiss by Order dated August 27, 2007. (Def.'s Mot. 3;

Pl.'s Resp. 3.)

## IV.     Standard of Review

A court should grant summary judgment if "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986). A factual dispute is material when it "might affect the outcome of the suit under the governing law." Id. In considering a motion for summary judgment, the "facts must be viewed in the light most favorable to the party opposing summary judgment." Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations, or suspicions" to support its claim. Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982).

## V.   Discussion

### A.  Statute of Limitations

In its Motion for Summary Judgment, Allied argues that plaintiff's claims should be dismissed as time barred. (Def.'s Mot. 21.) Specifically, Allied states that once the EEOC issues a Notice of Right to Sue, plaintiff must file suit within ninety days from receipt of the Right to Sue in order to commence a lawsuit. (Id.) Indeed, this requirement is explicitly stated on the EEOC's Notice of Right to Sue form. (EEOC Dismissal and Notice of Rights, Feb. 8, 2007, Ex. I to Def.'s Mot. ("You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit must be filed **WITHIN 90 DAYS** from your receipt of this Notice; otherwise your right to sue based on this charge will be lost.").)

Allied contends that because plaintiff's complaint was not accompanied by the complete filing fee and thus was not filed and docketed by the Prothonotary until May 16, 2008—96 days after plaintiff's February 9, 2007 receipt of the Notice of Right to Sue—plaintiff failed to file within the applicable statute of limitations period. (Def.'s Mot. 21–22.) Plaintiff counters that he filed his complaint on May 8, 2007, within the statute of limitations period, because the Prothonotary received the complaint on May 8, 2007 and stamped it "Attest - May 8, 2007."

11

(Pl.'s Supplement Br. Opp. Def.'s Mot. 1.) Plaintiff argues that under Pennsylvania law, which is applicable to the filing of suit in state court, "a document is 'filed' when received by the Prothonotary, regardless of when it is later time-stamped." (Id. at 3 (citing Griffin v. Central Sprinkler Corporation, 823 A.2d 191 (Pa. Super. Ct. 2003).) "The Prothonotary's failure to docket the Complaint on May 8, 2007," plaintiff continues, "constituted a breakdown in court operations." (Id.)

The Court concludes that plaintiff filed suit within the limitations period. Under Pennsylvania law—which plaintiff correctly notes is applicable to the commencement of suit in state court before removal to federal court—plaintiff's complaint should be considered "filed" at the moment it was received by the prothonotary. Rather than looking to when the document was time-stamped, which "is nothing more than a ministerial act following the actual filing of the document," a document "must be deemed to have been 'filed' the moment that it passed through the doorway of the . . . Prothonotary's Office." Griffin v. Central Sprinkler Corporation, 823 A.2d 191, 198 (Pa. Super. Ct. 2003).

Moreover, Pennsylvania courts have held that this rule applies even if the documents received for filing are incomplete or defective. Nagy v. Best Home Services, Inc., 829 A.2d 1166, 1170 (Pa. Super. Ct. 2003) (citing Criss v. Wise, 781 A.2d 1156, 1159 (2001)) (stating that the Prothonotary "must inspect documents that are sent for filing to ensure they are in the proper form" but not to determine whether filings "are timely" which would be "inconsistent with our supreme court's pronouncement that a document is filed when the Prothonotary receives it"); see also Amicone v. Rok, 839 A.2d 1109, 1115 (Pa. Super. Ct. 2003) (stating that, when an appeal petition was defective for lack of a cover sheet, "the prothonotary's office was responsible for

notifying [appellant] that his filing was defective so that [appellant] could correct it through amendment or addendum," but that "the prothonotary's office was without the power to reject the appeal"); Robinson v. Yue, 5 Pa. D. & C. 5th 489, 298 (Pa. Com. Pl. 2008) (stating that a submission to the prothonotary that was defective for failure to comply with a Pennsylvania Rule of Civil Procedure was "timely filed since it was physically received by the prothonotary" "notwithstanding" the defect).

The Notice of Right to Sue was received on February 9, 2007. Plaintiff had ninety (90) days from that date—that is, until May 8, 2007—by which to file the complaint. The Court concludes that the complaint was timely filed within the limitations period on May 8, 2007—the date when Federal Express delivered plaintiff's complaint to the Prothonotary and the complaint "passed through the doorway" of the Prothonotary's Office. The failure of plaintiff to pay the complete filing fee on that date and the ultimate docketing of the complaint on May 16, 2007 do not alter the fact that, under Pennsylvania law, the complaint was deemed to be filed when it was first received by the Prothonotary on May 8, 2007. Accordingly, Allied's statute of limitations argument is rejected.

**B.  Count I: Race and National Origin Discrimination**

Plaintiff asserts a claim for discrimination on the basis of race and national origin under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), and 42 U.S.C. § 1981. Plaintiff alleges that Allied treated non-Iranian, light-complected employees more favorably than him and terminated him because of his race and national origin. (Pl.'s Resp. 2, 7.)

The familiar framework for evaluating summary judgment motions under Title VII of the Civil Rights Act and 42 U.S.C. § 1981 was established by the Supreme Court in McDonnell

13

Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). The Supreme Court further explained the

framework in Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252 (1981):

> First, the plaintiff has the burden of proving by the preponderance of the evidence
> a prima facie case of discrimination. Second, if the plaintiff succeeds in proving
> the prima facie case, the burden shifts to the defendant "to articulate some
> legitimate, non discriminatory reason for the employee's rejection." . . . Third,
> should the defendant carry this burden, the plaintiff must then have an opportunity
> to prove by a preponderance of the evidence that the legitimate reasons offered by
> the defendant were not its true reasons, but were a pretext for discrimination.

Id. (quoting McDonnell Douglas, 411 U.S. at 802) (citations omitted).

### 1.   Plaintiff's Prima Facie Case of Discrimination

Under the McDonnell-Douglas framework, plaintiff first has the burden of proving by a

preponderance of the evidence a prima facie case of discrimination. Id. In the context of a

challenge to an adverse employment action, plaintiff's prima facie case requires demonstration

that: (1) plaintiff is a member of a protected class; (2) plaintiff was qualified for his position; (3)

plaintiff suffered an adverse employment action; and (4) the circumstances of his discharge

permit an inference of unlawful discrimination, such as might occur when the position is filled by

a person not of the protected class. Pivirotto v. Innovative Sys., 191 F.3d 344, 352 n.4 (3d

Cir.1999).

In this case, it is undisputed that plaintiff has satisfied the first three elements of his prima

facie case: he is a member of a protected class, was qualified for his position, and suffered an

adverse employment action. (Def.'s Mot. 11; Pl.'s Resp. 6.) However, defendant contends that

plaintiff has failed to establish the fourth element of his prima facie case—namely, that the

circumstances of his discharge do not permit an inference of unlawful discrimination. (Def.'s

Mot. 11.) Specifically, defendant argues that there is no basis for inferring discriminatory animus

14

because: (1) plaintiff cannot demonstrate that he was treated less favorably than any similarly situated, non-minority employees, and (2) Mr. Waggoner, the Human Resources Manager responsible for terminating plaintiff, was not aware of plaintiff's race or national origin. (Id. at 11–12.) Plaintiff counters that an inference of discrimination is appropriate because: (1) Mr. Foster, a non-Iranian, light-complected employee with a history of aggressive and verbally abusive behavior for which he was never disciplined, was treated more favorably than plaintiff, and (2) Mr. Waggoner's investigation into the March 1, 2006 incident between plaintiff and Mr. Foster was "desultory" and inadequate. (Pl.'s Resp. 7–9, 10–11.)

However, the Court need not decide whether plaintiff has established the fourth element of his prima facie case. This is because, assuming *arguendo* that plaintiff did make out a prima facie case, plaintiff's claim would nevertheless fail under the third prong of the McDonnell-Douglas burden-shifting framework. Specifically, plaintiff has presented no evidence that defendant's proffered reason for terminating plaintiff is pretextual.

### 2. Defendant's Legitimate, Non-Discriminatory Reason for Termination

Assuming *arguendo* that plaintiff has established a prima facie case, the defendant then has the burden of producing a legitimate, non-discriminatory explanation for its decision to terminate plaintiff. The Court concludes that Allied has articulated such a reason in this case. Specifically, Allied based its decision to terminate plaintiff on an investigation demonstrating that plaintiff "physically assaulted Mr. Foster," plaintiff's own admission that he touched Mr. Foster, and Allied's disciplinary policy that "subjects [an] employee to discharge" the first time such an offense is committed. (Def.'s Mot. 14; Pliner Dep. 33:9–12.); see Money v. Provident Mutual Life Insurance Co., 189 Fed. Appx. 114, 116 (3d Cir. 2006) ("Committing violence in the

15

workplace is clearly a legitimate, nondiscriminatory reason for terminating an employee.").

At this point, the burden shifts back to plaintiff to demonstrate that defendant's proffered explanation for the adverse employment action is a pretext for discrimination.

### 3.  Plaintiff's Evidence That Defendant's Reason Is Pretextual

In order to prove pretext, plaintiff can either: (1) present evidence that "'casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication,'" or (2) present evidence that "'allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" Akinson v. Lafayette College, 460 F.3d 447, 454 (3d Cir. 2006) (quoting Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994)). "This burden is met through demonstration that such 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action are such that a reasonable factfinder could rationally find them unworthy of credence.'" Rosario v. Ken-Crest Servs., No. 05-CV-3378, 2006 U.S.App. LEXIS 13815, at *7 (3d Cir. June 5, 2006) (quoting Fuentes, 32 F.3d at 765). "Because the ultimate issue is whether 'discriminatory animus' motivated the employer," it is insufficient to show that the employer's decision was "wrong or mistaken." Coulton v. Univ. of Pa., 237 Fed. Appx. 741, 747 (3d Cir. 2007); Money, 189 Fed. Appx. at 116.

Plaintiff seeks to establish pretext in two ways. First, plaintiff argues that defendant failed to demonstrate that other employees were discharged for physical assault prior to plaintiff's termination. (Pl.'s Resp. 13.) Specifically, plaintiff states that "Mr. Waggoner admitted that prior to Mr. Parsia, no other Allied employees [had] been discharged for alleged physical assault." (Id.)

16

However, plaintiff cannot demonstrate pretext by pointing to an absence of evidence produced by

defendant. Rather, under the McDonnell-Douglas burden-shifting framework, the burden falls

upon plaintiff to prove that defendant's reason is pretextual. On the issue of defendant's failure to

treat similarly situated persons in the same manner as it treated plaintiff, plaintiff has failed to

show any genuine issue of material fact. Thus, the Court must reject plaintiff's argument on this

ground.

Second, plaintiff argues that defendant's reason is pretextual because Mr. Foster, a non-

Iranian, light-complected employee who had a history of aggressive and verbally abusive

behavior, was never disciplined for his conduct and thus was treated more favorably than

plaintiff. (Pl.'s Resp. 13.)  In contrast, plaintiff points out that he had no anger management

issues and was terminated for "pushing" Mr. Foster. (Id.) The Court rejects this argument on the

ground that Mr. Foster and plaintiff are not similarly situated. (Def.'s Reply Br. 8–10.)

Evidence that employees are similarly situated is necessary to demonstrate that one

employee was treated more favorably than the other and that such preferential treatment gives

rise to an inference that "discrimination was more likely than not a motivating or determinate

cause" of plaintiff's termination. Gazarov v. Diocese of Erie, 80 Fed. Appx. 202, 205 (3d Cir.

2003). To be similarly situated, the individuals must have engaged in the same conduct and share

in common all relevant aspects of their employment. See Id. at 206 (noting that individuals are

similarly situated only where they engaged in "the same conduct," and finding different conduct

where one individual made racially derogatory comments and the other was involved in a fight);

Red v. Potter, 211 Fed. Appx. 82, 84 (3d Cir. 2006) (citing Kosereis v. Rhode Island, 331 F.3d

207, 214 (1st Cir. 2003) and Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir.

17

1994)) (noting that in order to be similarly situated, individuals must be "similarly situated in all relevant respects," including that "all of the relevant aspects of employment need to be nearly identical"); see also Elgabi v. Toledo Area Regional Transit Authority, 228 Fed. Appx. 537, 541 (6th Cir. 2007) (noting that in order to be similarly situated, the individuals "'must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'") (quoting Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998)).

In this case, the Court concludes that Mr. Foster was not similarly situated to plaintiff. Mr. Foster held a more senior management position than plaintiff, had a different supervisor than plaintiff, performed different activities than plaintiff, and had been employed at Allied for a vastly longer time period. (Parsia Dep. 46:1–10, 40:9–15, 41:24–43:19, 44:12–23, 46:8–10; Foster Dep. 12:8–9, 13:7–11.) Moreover, plaintiff is alleged to have physically touched Mr. Foster, whereas plaintiff admits that Mr. Foster's prior aggressive conduct never involved touching another employee. (Parsia Dep. 112:9–17.) The fact that their conduct differs and they do not share in common all relevant aspects of their employment demonstrates that plaintiff and Mr. Foster are not similarly situated. See Gazarov, 80 Fed. Appx. at 206. Even if a genuine issue of fact exists as to the nature of plaintiff's contact with Mr. Foster (viz., whether plaintiff benignly touched, pushed, or assaulted Mr. Foster), it is not material to the determination that plaintiff and Mr. Foster are not similarly situated with respect to their conduct and employment. Thus, plaintiff's argument that Mr. Foster was treated more favorably than him and that such preferential treatment gives rise to an inference of discrimination must be rejected.

Because plaintiff has presented no evidence demonstrating a genuine issue of material fact as to whether race or national origin played a role in the decision to fire him, he cannot withstand summary judgment on Count I. The Court accordingly grants defendant's Motion for Summary Judgment with respect to Count I of the Amended Complaint in which plaintiff asserts a claim of race and national origin discrimination.

### C.  Count II: Religious Discrimination

Plaintiff's second claim is for religious discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e), and 42 U.S.C. § 1981. Plaintiff alleges that Allied discriminated against him on the basis of his Zorastrian religion. "In a post-9-11 world, citizens of the United States are arguably more 'aware' of middle-Eastern appearance, and may presume non-Christian religion to accompany a middle-Eastern appearance." (Pl.'s Resp. 12.)

To make out a claim for religious discrimination, the Third Circuit has recognized two theories on which employees may rely: "disparate treatment" or "failure to accommodate." Abramson v. William Paterson College of N.J., 260 F.3d 265, 281 (3d Cir. 2001). Plaintiff alleges "disparate treatment." For a "disparate treatment" theory, "the prima facie case and evidentiary burdens of an employee . . . mirror those of an employee alleging race or sex discrimination." Id. Thus, the three-step McDonnell-Douglas burden-shifting framework applies:

> The plaintiff must demonstrate that she (1) is a member of a protected class, (2) was qualified and rejected for the position she sought, and (3) nonmembers of the protected class were treated more favorably. . . . After the plaintiff establishes a prima facie case, the employer must proffer a legitimate, non-discriminatory reason for the adverse employment decision. Once the employer does so, the plaintiff must demonstrate that the proffered reason was pretextual.

Id. at 281–82 (citing Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 318–19 (3d Cir.

2000) and Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)).

In addition, demonstrating a prima facie case of religious discrimination requires evidence that the employer had knowledge of plaintiff's religion. Since an "employee's religion . . . is often unknown to the employer," the Third Circuit has required "that employees [have] informed their employers of their religious beliefs prior to the alleged discriminatory action" in order to make out a prima facie case for discharge on account of religion. Geraci v. Moody-Tottrup, Intern., Inc. 82 F.3d 578, 581 (3d Cir. 1996) (citing Protos v. Volkswagen, Inc., 797 F.2d 129, 133 (3d Cir. 1996), cert. denied, 479 U.S. 972 (1986) and Beasley v. Health Care Serv. Corp., 940 F.2d 1085, 1088 (7th Cir. 1991).)

In this case, plaintiff has not established a prima facie case of religious discrimination—the first prong of the McDonnell-Douglas framework. That prong of the McDonnell-Douglas framework requires a plaintiff to establish that non-members of the protected class were treated more favorably, and plaintiff has failed to do so. Plaintiff argues that Mr. Foster, who is "not presumptively non-Christian," was treated more favorably than plaintiff in the same manner discussed in Part V.B.3., *supra*, with respect to plaintiff's race and national origin discrimination claims—namely, that Mr. Foster's aggressive and verbally abusive behavior went undisciplined while plaintiff's alleged "pushing" was punished with termination. (Pl.'s Resp. 7–8.)  However, for the reasons stated in Part V.B.3., *supra*, and without considering whether defendant was aware of plaintiff's religion, plaintiff has not demonstrated that the alleged preferential treatment of Mr. Foster gives rise to an inference of discrimination because plaintiff is not similarly situated to Mr. Foster. Accordingly, the Court grants defendant's Motion for Summary Judgment on Count II in which plaintiff asserts a claim of religious discrimination.

### D.  Count III: PHRA Claim

Plaintiff's third and final claim is that Allied created a hostile work environment under the PHRA, 43 Pa. C.S.A. § 951. Plaintiff alleges that he was subject to a hostile work environment because of his race, national origin, and religion. (Am. Compl. ¶ 55–59.)

In order to establish a hostile work environment claim, plaintiff must prove five elements: "'(1) the employee suffered intentional discrimination because of [membership in a protected group]; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same [protected group] in the same position; and (5) the existence of respondent superior liability.'" Shramban v. Aetna, 262 F. Supp. 2d 531, 535 (E.D. Pa. 2003) (quoting Kunin v. Sears Roebuck & Co., 175 F.3d 289, 295 (3d Cir. 1999) (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990))). Courts must examine the "totality of the circumstances" in determining whether a work environment was sufficiently hostile, which includes: "the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Shramban, 262 F. Supp. 2d at 535 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998)).

In this case, the only evidence plaintiff presents of a hostile work environment is Mr. Davison's use on five to ten occasions of "the F word" against plaintiff. (Parsia Dep. 92:6–12, 93:8–9, 94:18–95:1.) Plaintiff stated that Mr. Davison's comments "[had] to do with leakage and the area that he was supposed to supervise." (Id. at 92:11–12.) Plaintiff also considers the events surrounding the March 1, 2006 incident as another instance of Mr. Davison's "bullying." (Id. at

21

91:11–13, 93:20–24.) Defendant responds by noting that plaintiff presents "no evidence that Mr. Davison's comments were made 'because of' plaintiff's national origin, religion or race." (Def.'s Mot. 17.)

Viewing the evidence in a light most favorable to plaintiff, the Court concludes that there is no genuine issue of material fact that plaintiff was subject to a work environment sufficiently hostile to satisfy the requirements of the PHRA. For instance, plaintiff presents no evidence that Mr. Davison's comments were motivated by plaintiff's race, national origin, or religion as required by the first element of the applicable legal standard. Indeed, "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to" an actionable claim under the PHRA. Faragher, 524 U.S. at 788. The Supreme Court has made clear that the legal standard for hostile work environment claims seeks to "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language . . . .'" Id. at 788 (quoting  B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992)). The most plaintiff can demonstrate is that "offhand comments" or the "sporadic use of abusive language" occurred which—however imprudent or objectionable—do not make out a claim for hostile work environment.

Accordingly, the Court grants defendant's Motion for Summary Judgment on Count III in which plaintiff asserts a hostile work environment claim under the PHRA.

## VI.   Conclusion

For the foregoing reasons, the Court grants defendant's Motion for Summary Judgment

on all plaintiff's claims and enters judgment in favor of defendant Allied Tube & Conduit

Corporation and against plaintiff Parviz Parsia.


**BY THE COURT:**


**/s/ Honorable Jan E. DuBois**
_____

**JAN E. DUBOIS, J.**